IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Jonna Washington, | |
| | Case No. 1:15-CV-00354 |
| Plaintiff, | |
| | Judge: Susan J. Dlott |
| v. | Magistrate Judge: Karen L. Litkovitz |
| EVERBANK, et al., | |
| Defendants. | |

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS EVERBANK AND DITECH FINANCIAL LLC FKA GREEN TREE SERVICING LLC

Now comes Defendants EverBank and Ditech Financial LLC fka Green Tree Servicing LLC (hereinafter "Ditech") (hereinafter collectively referred to as "Defendants"), by and through counsel, and pursuant to Rule 56 of Federal Rules of Civil Procedures moves for Summary Judgment on the issue of whether Plaintiff is entitled to recover damages against Defendants for her claims under Fair Debt Collection Practices Acts, Retail Installment Sales Practices Act and/or Fraud. On these issues, there are no genuine issues on material fact and, therefore, Defendants are entitled to Judgment as a matter of law. The basis for this motion is more fully set forth in the attached memorandum in support.

<u>**MEMORANDUM IN SUPPORT**</u>

**I.     FACTUAL BACKGROUND**

The facts in a light most favorable to the nonmoving party are as follows:

In 1968 Plaintiff's parents purchased the home located at 1045 Church Ave. Cincinnati, Ohio 45246 (hereinafter "Real Estate"). (Plaintiff depo. pg. 16). After the death of Plaintiff's father in 1996 Plaintiff received one half interest in the Real Estate pursuant to a Certificate of Transfer. **See attached Exhibit A.** At the time of transfer, it was Plaintiff's impression that she was now obligated on the debt for the Real Estate. (Plaintiff depo. pg.'s 18-19). However, she never consulted with an attorney to determine whether her understanding on her liability on the debt was correct until she retained her current counsel. (Plaintiff depo. pg.'s 19-20)

In June 2002, Plaintiff's mother, Janet Washington, refinanced the loan encumbering the Real Estate. (Plaintiff depo. pg. 23).  Janet Washington, alone, executed a Note to Safeway Mortgage in the principal amount of $101,000. (hereinafter "Loan") **See Note attached hereto as Exhibit B**. Janet Washington and the Plaintiff executed a Mortgage encumbering the Real Estate. (Plaintiff depo. pg. 25). The Real Estate was refinanced because Plaintiff's mother needed money. (Plaintiff depo. pg. 27). At the time the Real Estate was refinanced, Plaintiff did not think she was required to make the monthly mortgage payments because she thought that it was her mother's responsibility. (Plaintiff depo. pg. 29). Until her mother's death in 2007 Plaintiff's mother made all of the mortgage payments due on the Note. (Plaintiff depo. pg.'s 21-22).

Shortly, after her mother's death, Plaintiff moved into the Real Estate and began making the monthly mortgage payments. (Plaintiff depo. pg. 34).

By her own admission, over the next four to five years, Plaintiff did not make all of the required monthly mortgage payments and the loan went into default. (Plaintiff depo. pg. 34). Because of the default, on May 20, 2013, then servicer of the loan, EverBank, initiated foreclosure proceedings against the Real Estate. **See attached Exhibit C.** During the pendency of the foreclosure Plaintiff applied for a Loan Modification. Effective May 1, 2014, servicing of the Loan that was refinanced by Janet Washington was transferred from EverBank to Ditech. (S. Derrick depo. pg. 43). On July 3, 2014 Ditech sent a letter to Plaintiff informing her that she was approved for "an account modification Trial Period Plan." **See attached Exhibit D.**

Pursuant to the Trial Period Plan, Plaintiff was required to make three payments in the amount of $830.38 each for the months of August, September and October 2014 and execute an Assumption Agreement to assume the obligations of the Loan. **See attached Exhibit d**. The Assumption Agreement was necessary because Plaintiff did not execute the Note when the property was refinanced in 2002 and she had no financial obligation under the Loan. (S. Derrick depo. pg.'s108-109 and 148)

There is no dispute that Plaintiff made the three required Trial Period Plan payments and signed and returned to Ditech the Loan Modification document. Unfortunately, Plaintiff did not contact Ditech to arrange to schedule a closing for the Loan Assumption that was required as part of the loan modification process. (S. Derrick depo. pg. 110) Between October 22, 2014 and December 3, 2014, Ditech contacted Plaintiff no less than eight times leaving messages with the Plaintiff to advise her of the need to schedule the Loan Assumption closing. (S. Derrick depo. pg's 120 and 138-139). On November 26, 2014, because of investor time lines and Ditech's inability to contact Plaintiff to schedule the Loan Assumption closing, Ditech was in the process of cancelling the Loan Modification. (S. Derrick depo. pg's 126-128). Finally, on December 3,

2014, Ditech employee Fred Lance was able to contact Plaintiff and scheduled the Loan Assumption closing. **A recorded copy of Ditech's phone call with Plaintiff is being manually filed under seal with the Court as Exhibit E**. The closing was scheduled to take place at Plaintiff's house at 4:30 p.m. on December 16, 2014. (S. Derrick depo. pg. 130)

The day prior to the scheduled Loan Assumption closing Plaintiff experienced a death in her family. (Plaintiff depo. pg. 59). For this reason, Plaintiff contacted Ditech and cancelled the closing scheduled for December 16, 2014. (Plaintiff depo. pg. 59).

Despite representations to the contrary, Plaintiff did not attempt to contact Ditech to reschedule the Loan Assumption closing until December 23, 2014. (Plaintiff depo. pg's 62-64). By this time the modification had been cancelled and the process closed by Ditech. (Plaintiff depo. pg. 62). When Plaintiff contacted Ditech on December 23, 2014 she was advised of Ditech's decision, advised that a letter explaining her options had been mailed out to her and that she could reapply. (Plaintiff depo. pg's 62-63) (S. Derrick depo. pg. 145).

In January 2015, Plaintiff and Mr. Jones[1] submitted a Loan Modification Application to Ditech. (Plaintiff depo. pg. 66). On January 23, 2015, Ditech sent a letter to Plaintiff informing her that her application had been received but was not complete and provided her a list of additional documents she needed to submit by February 22, 2015 in order for her application to be complete. **See attached Exhibit F.** Plaintiff did not provide all of the required additional documents for review by February 22, 2015. (S. Derrick depo. pgs. 174, 177-179).

After the original Loan Modification application was closed and cancelled Ditech resumed the foreclosure process. The Real Estate was set for Sheriff's Sale on March 5, 2015. (S. Derrick depo. pg. 174). Plaintiff did not timely submit a complete loss mitigation application

---

[1] Mr. Jones was a friend of Plaintiff's who lived with her and his income was being used to determine whether Plaintiff qualified for a loan modification.

prior to that date so the Real Estate sold at sale. (S. Derrick depo. pgs. 173-174 and 177-179). The property was bought back by Ditech at the foreclosure sale.

There is no dispute between the parties that after the foreclosure process was complete, Plaintiff submitted a completed Loan Modification application. Based upon the complete submission, Plaintiff was approved for a Loan Modification and a Loan Assumption. Plaintiff signed the Loan Modification documents and appeared at the closing to complete the Loan Assumption process. (S. Derrick depo. pg. 184). The process completed on April 19, 2016. (Id.)

Plaintiff has sued Ditech and EverBank alleging that Defendants' actions in connection with respect to the loan modification process violated the Fair Debt Collection Practices Act (hereinafter referred to as "FDCPA"), Real Estate Settlement Procedures Act (hereinafter referred to as "RESPA") and constituted fraud. Plaintiff lacks standing to bring claims under either RESPA or the FDCPA and cannot prove fraud. Therefore, for these reasons and those set forth more fully below Defendants are entitled to summary judgment.

## LAW AND ARGUMENT

## II.     SUMMARY JUDGMENT STANDARD

As this Court is aware, the standard for summary judgment is well established. Rule 56 of the Federal Rules of Procedures provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." All evidence must be reviewed in a light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598 (1970).

Construing all of the evidence in Plaintiff's favor, the evidence to be submitted to this Court will establish that Plaintiff was neither a borrower nor consumer as those terms are defined

5

in the Federal Statutes and, therefore, lacks standing under RESPA and the FDCPA to assert her claims. Furthermore, Plaintiff cannot meet her burden to support a claim for fraud.

The plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of a nonmoving party's case necessarily renders all other facts immaterial.   Celotex Corp. v. Myrtle Nell Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986); See also, Wing v. Anchor Media Ltd. of Texas, 59 Ohio St.3d 108, 570 N.E. 2d 1095 (1991); Dresher v. Burt, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

In Wing, the Ohio Supreme Court incorporated the Celotex decision and held that "a motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial."   Wing, 59 Ohio St.3d at 111. Therefore, in order for Plaintiff to defeat Defendants' Motion for Summary Judgment, she must put forth reliable credible evidence to substantiate her claims and demonstrate that during the loan modification process she met the definition of a borrower or consumer and was entitled to the protections afforded a borrower and/or consumer under either RESPA or the FDCPA.

To create a genuine issue of material fact necessitating trial, Plaintiff must produce specific evidence on every element essential to its case.  Celotex, 477 U.S. at 323. In short, Plaintiff must put forth evidence demonstrating that she was a borrower or consumer of Ditech at the time in question. Absent such evidence, Ditech is entitled to summary judgment.

A.     **Plaintiff lacks standing to assert a Real Estate Settlement Procedures Act Claim**

In Plaintiff's Complaint, she alleges that Defendants violated 12 C.F.R. § 1024.35 and/or § 1024.41 of Regulation X in failing to properly respond to and/or evaluate her Loss Mitigation application.

Plaintiff's claim against Ditech and EverBank for violations of RESPA all emanate from the loan modification process that started in the spring of 2014. (Plaintiff depo. pg. 8) Plaintiff alleges that Ditech did not provide her with correct notices, failed to exercise reasonable diligence in obtaining information and documentation to complete the process, failed to review her for all loss mitigation options, failed to serve her with timely notices, failed to halt the foreclosure process, failed to timely return her phone calls and failed to notify her of her right to appeal. Plaintiff's Complaint ¶ 133, 134, 135, 136, 137, 139 and 141.

As this Court is aware, Regulation X became effective on January 10, 2014. Plaintiff alleges that Defendants violated Regulation X which prohibits, among other things, a loan servicer from foreclosing on a property under certain circumstances if the borrower has submitted a complete loan modification or loss mitigation application. However, Plaintiff, lacks standing to bring her RESPA claims against Defendants. As Plaintiff acknowledged in her deposition, she did not sign the Note. (Plaintiff depo. pg. 27).

While Plaintiff attempts to create confusion where none exists by suggesting in her deposition she had an obligation to pay on the Note, the Mortgage is very clear and alleviates any confusion regarding her obligation. (Plaintiff depo. pg.'s 18-19)  Paragraph 13 of the Mortgage states in pertinent part:

> 13.  **Joint and Several Liability; Co-signers; Successors and Assigns Bound**. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument

but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note *without* the co-signer's consent.

**See attached Exhibit G (emphasis added)**

As a co-signor on the Mortgage Plaintiff had no obligation on the Note and because she was not a borrower, she is therefore, not entitled to any of the protections afforded a "borrower" under the provisions of RESPA.

Taking this into consideration, it is axiomatic, that in order for Plaintiff to succeed on her RESPA claim she must be a signatory on the Note. It is undisputed that Plaintiff is a non-signatory to the Note. Pursuant to 12 C.F.R. § 1024.41(a), violations of 12 C.F.R. § 1024.41 are enforced under § 909 6(f) of RESPA (12 U.S.C. 2605(f)). 12 U.S.C. Section 2605 specifically states that civil liability under RESPA is limited to borrowers. In this case, because Plaintiff did not sign the Note, she is not a borrower, and therefore, she lacks standing under RESPA to bring her Regulation X claims.

It is anticipated that Plaintiff will argue that the issue of whether a non-borrower is entitled to the protection of RESPA is a case of first impression in this District. However, this issue has already been presented to this Court for consideration in the case of Cooper v. Faye Servicing, 115 F. Sup 3d 900 (2015). In Cooper this very Court found that the non-signatory spouse to the Note lacked standing under RESPA to bring her Regulatory X claims. Id. 908. See also, Leblow v. BAC Home Loan Servicing, LP (W.D.N.C. May 28, 2013) (finding non-signatory spouse on Note lacked standing to assert a RESPA claim because she was not a 'borrower').

Based upon the precedent set by this Court in the case of <u>Cooper</u>, <u>supra</u>, Plaintiff lacks standing to assert a claim under RESPA because she is not a borrower. There is no genuine issue of material fact on this point, thus Defendants are entitled to summary judgment as a matter of law.

**B.**   **Plaintiff lacks standing to assert a claim against Defendants for violation of the Fair Debt Collection Practices Act**

To plead a claim under the FDCPA a plaintiff must show: (1) she is a "consumer" as defined in 15 U.S.C. § 1692a; (2) the "debt" arises out of a transaction which is "primarily for personal, family or household purposes"; (3) defendant is a "debt collector" as defined in the FDCPA; and (4) defendant has violated one of the prohibitions in the FDCPA. <u>Wallace v. Washington Mut. Bank, FA</u>, 683 F. 3d 323, 326 (6th Cir. 2012); <u>Wittiker v. Deutsche Bank Nat'l Trust Co.</u>, 605 F. supp 2d, 914, 928 (N.D. Ohio 2009).

Plaintiff's claim fails as a matter of law for two reasons (1) Plaintiff has not properly plead that she is not a consumer as that term is defined for the purposes of the application of the FDCPA; and (2) Defendants never attempted to collect a debt from her.

By Plaintiff's own admission she is a non-signatory to the Note. (Plaintiff depo. pg. 27). Furthermore, she has no recollection of anyone at Ditech or EverBank telling her that she was personally obligated to pay the debt; does not recall ever receiving a letter from anyone at Ditech or EverBank telling her she had to pay the debt; and does not recall ever being harassed or threatened with legal action by anyone at Ditech or EverBank if she did not make the mortgage payments. (Plaintiff depo. pg. 48). The only reason Plaintiff believed that she had to make the mortgage payments after the death of her mother was because she owned her father's ½ interest in the Real Estate upon his death and signed the Mortgage when the Real Estate was refinanced in 2002 by her mother. (Plaintiff depo. pg.'s 49-50).

9

The term consumer is defined as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a (3) In the case sub judice, Plaintiff is not a consumer because she had no obligation to pay the debt or alleged by anyone to have to pay the debt associated with the Real Estate; which is consistent with the language contained in Paragraph 13 of the Mortgage. **See attached Exhibit G**. For this reason, and this reason alone Plaintiff's FDCPA claim against Defendants fails.

Even if this Court determines that Plaintiff is a consumer, her FDCPA claim still fails. Plaintiff has not plead in her Complaint and cannot present any evidence to this Court demonstrating that Defendants violated any of the prohibitions set forth in the FDCPA. Once again by Plaintiff's own admission, Defendants did not attempt to collect a debt from her, never sent her any harassing emails or letters threatening collection activity if she did not make the mortgage payments, and never sent her any letters telling her that she owed the debt.

Plaintiff cannot provide this Court with even a scintilla of evidence to support her FDCPA claim. In support of Defendants position, one need to look no further than the Foreclosure Complaint. When EverBank filed its Foreclosure Complaint, it plead for judgment in rem against the Plaintiff. Plaintiff cannot put forth any evidence to support her claim that EverBank or Ditech has violated the FDCPA. Plaintiff is not a consumer as specifically defined in the FDCPA and none of the actions taken by Defendants with respect to the loan violated the FDCPA.

Therefore, because Plaintiff cannot provide any evidence to substantiate her claims for FDCPA violations, Ditech is entitled to judgment on this claim as a matter of law.

**C.**     **Plaintiff cannot support a claim of common law fraud**

The elements of common law fraud are:

(a)     a representation or, where there is a duty to disclose, concealment of a fact,

(b)     which is material to the transaction at hand,

(c)     made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d)     with the intent of misleading another into relying upon it,

(e)     justifiable reliance upon the representation or concealment, and

(f)     a resulting injury proximately caused by the reliance.

Burr v. Board of County Com'rs of Stark County, 23 Ohio St.3d at 69 (1986).

All of these elements must be present to support and succeed on a claim for fraud.

Plaintiff claims that a December 4, 2014 loan modification correspondence from Ditech which set a January 3, 2015 acceptance date, combined with the December 17, 2014 correspondence closing the loan modification process, was false or misleading.  However, on December 23, 2014 Plaintiff had a telephone conversation with Ditech employee Kendra Flood, which essentially confirmed the contents of the December 17, 2014 letter.  (Plaintiff depo. pg. 62).  Plaintiff then alleges that she "relied on the December 17, 2014 loan modification denial letter and the December 23, 2014 correspondence and did not submit the executed copy of the loan modification agreement to Ditech".  Plaintiff's Complaint ¶ 220.

Plaintiff's claim for fraud fails because Plaintiff cannot establish a genuine issue of material fact because the record is clear that Ditech made no false representation or had no intention of misleading Plaintiff into relying upon either the December 17, 2014 letter or the telephone conversation of December 23, 2014 informing her that the modification had been closed out. Plaintiff did not rely on either the letter or the telephone conversation.

**a.     Ditech made no false representation to the Plaintiff.**

11

Ditech made no false representation to this Plaintiff. While Ditech did send a letter to Plaintiff dated December 4, 2014 indicating that she had until January 3, 2015 to submit an executed loan modification agreement, Plaintiff was additionally advised and reminded on no less than eight occasions between October 22, 2014 and December 3, 2014 that she must schedule a d closing to execute the Loan Assumption in order to assume the Loan. (S. Derrick depo. pg. 139). Plaintiff cancelled the closing of December 16, 2014 but then failed to contact Ditech until December 23, 2014 to reschedule. (Plaintiff depo. pg. 59). Investor guidelines and Plaintiff's failure to complete the loan modification process in a timely manner is why the loan modification process was closed on December 17, 2014. (S. Derrick depo. pg's 120, 126-128 and 138-139) A material misrepresentation can only be found if one infers the December 4, 2014 letter contained an immutable, irrevocable and unconditional offer to keep the loan modification process open until January 3, 2015, which it does not.

**b.      Plaintiff cannot establish detrimental reliance or any injury based upon any Ditech communication.**

Plaintiff cannot establish how she relied upon any communication from Ditech to her detriment, or that she suffered any injury based upon any such communication. In fact, ultimately, Plaintiff did submit a complete loan modification package and entered into loan modification agreement which process completed on April 19, 2016. (S. Derrick depo. pg. 185). This alone disposes of any claim of reliance and thus fraud.

By her own admission, Plaintiff acknowledges that she was informed by Ditech during a December 23, 2014 conversation that "if you qualified once, you'll probably qualify again." (Plaintiff depo. pg. 64)

Furthermore, Plaintiff testified in her deposition that she learned that the modification was closed out in a December 23, 2014 phone conversation with Ms. Flood at Ditech. On that

same day she called Ditech back and was informed that she could reapply.  (Plaintiff depo. pg. 62-64).  Coming as it did from Rapid City, South Dakota, it appears likely that the December 17, 2014 loan modification denial letter had not yet been received by Plaintiff when, on December 23, 2014 she was informed that her modification had been closed out, but she could reapply and the process would be expedited.  (Plaintiff depo. pg. 62-64).  This shows that Ditech advised Plaintiff that not-withstanding the December 17, 2014 loan medication denial letter she could reapply and re-submit the required paperwork for a loan modification.

Even if one were to believe that the statements in Ditech's December 17, 2014 letter or phone conversations of December 23, 2014 were false, Plaintiff has shown nothing more than mental assent to these statements.  False representations or concealment alone are not actionable. Morris v. Investment Life Ins. Co. of America, 18 Ohio App.2d at 216 (Ohio App. 10 Dist. 1969).  There must exist a causal chain from the fraud of one party to the act of the other.  Id. The necessary causal link is called reliance.  Id.  Plaintiff cannot present any evidence that she acted in reliance on either the December 17, 2014 loan modification denial letter or the initial conversation with Ditech on December 23, 2014 informing her of the substance of that letter. Indeed had she relied on the denial letter, Plaintiff would not have reapplied for and ultimately prevailed in obtaining a Loan Modification and completing a Loan Assumption.

The facts reveal Plaintiff's Loan Modification and Assumption was not completed in December 2014 not due to any material misrepresentation on the part of Ditech but was because she failed for almost 2 months to cooperate with Ditech to complete. Ultimately, after cooperating in the process, providing a complete loan modification package and participating in the Assumption closing she obtained that which she wanted – a Loan Modification with a Loan

Assumption. For these reasons, Ditech is entitled to summary judgment on Plaintiff's claim for fraud.

## **CONCLUSION**

Defendants submit that even when the evidence is examined in a light most favorable to the Plaintiff reasonable minds would agree that Defendants are entitled to summary judgment.

There is no factual issue of fact on whether she has standing to assert a claim under either RESPA or the FDCPA. The evidence demonstrates that Plaintiff was not a borrower under the Note and, therefore, is afforded no protections under RESPA. This Court has already ruled in Cooper, supra, that a non-signatory spouse to a Note lacks standing under RESPA. Plaintiff did not sign the Note, consequently, she has no standing to assert a RESPA claim.

Similarly, Plaintiff is not a consumer as that term is defined in the FDCPA and has no standing under that statute to assert a FDCPA claim against Defendants. The same rational used by this Court in Cooper, supra, in deciding the plaintiff lacked standing to assert an RESPA claim is applicable to this case. Plaintiff was not a consumer for FDCPA purposes just as she is not a borrower for RESPA purposes. Applying the same analogy used in Cooper to Plaintiff's FDCPA claim leads to the same result – because Plaintiff is not a consumer she has no standing to assert an FDCPA claim.

Finally, regarding her fraud claim Plaintiff has failed to demonstrate that Ditech made any representations that she justifiably relied on that resulted in injury or damage. To the contrary, Ditech honored all representations made to the Plaintiff with respect to a loan modification. Once Plaintiff provided a complete loan modification package and cooperated in concluding the process she received a Loan Modification. There will be no evidence presented to the Court that will indicated otherwise.

For these reasons and those more fully set-forth above even when construing the evidence in a light most favorable to the Plaintiff reasonable minds can come to but one conclusion, and that conclusion is adverse to the Plaintiff. Therefore, EverBank and Ditech Financial LLC request this Court enter judgement in their favor as a matter of law.

Respectfully submitted,

/s/ David J. Demers
DAVID J. DEMERS (#0055423)
MICHELLE L. POLLY-MURPHY (#0072091)
Cooke Demers, LLC
260 Market Street, Suite F
New Albany, Ohio 43054
614-939-0930
614-939-0987 facsimile
Attorney for EverBank and Ditech Financial LLC
FKA Green Tree Servicing LLC

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Motion for Summary Judgment of Defendants EverBank and Ditech Financial LLC FKA Green Tree Servicing LLC was served upon the following parties, this 30th day of January, 2017, by first-class U.S. Mail, postage prepaid:

Timothy J. Cook, Esq.
Andrew J. Gerling, Esq.
Troy John Doucet, Esq.
700 Stonehenge Parkway, Suite 2B
Dublin, OH 43017
(614) 944-5219 Phone
(818) 638-5548 Fax
andrew@troydoucet.com
troy@troydoucet.com
Attorneys for Plaintiff


/s/ David J. Demers
DAVID J. DEMERS
MICHELLE L. POLLY-MURPHY

EXHIBIT

**A**

DEED

849593

## PROBATE COURT OF HAMILTON COUNTY, OHIO

ESTATE OF *John Robert Washington*, DECEASED

JOHN ROBERT WASHINGTON

CASE NO. 983926

REBECCA PREM GROPPE
HAMILTON COUNTY RECORDER
Doc #:98 - 152966  Type: DE
Filed:08/14/1998 11:09:56 AM  $ 18.00
Off.Rec.: 7728  2012 F  3  813

## CERTIFICATE OF TRANSFER

NO. 1

Decedent died on 2/12/96 owning the real estate

described in this certificate. The persons to whom such real estate passed by devise, descent or election are as

follows:

| Name | Residence Address | Interest in Real Estate so Passing |
|------|-------------------|-----------------------------------|
| Janet Washington | 1045 Church Ave. Glendale Oh 45246 | entire |

Examined & Compliance with Sec. 319.202 R.C. Conveyance is exempt from fee under Sec. Sec. 319.54 (F).3.?

DUSTY RHODES
HAMILTON COUNTY, OHIO

[Complete if applicable] The real estate described in this certificate is subject to a charge of $ _____

in favor of decedent's surviving spouse, _____ in respect of

the unpaid balance of the specific monetary share which is part of the surviving spouse's total intestate share.

7728  2012

FORM 12.1 - CERTIFICATE OF TRANSFER

The real estate, the transfer of which is memorialized by this certificate, is described as follows [describe below, using extra sheets if necessary. If decedent's interest was a fractional share, be sure to so state]:

*undivided ½ interest*

*see attached legal description*

_____8/14/98_____

Date Issued

This instrument was prepared by _____

Probate Judge _____

## AUTHENTICATION

I certify that the above document is a true copy of the original kept by me as custodian of the official records of this Court.

____8/14/98____

Date

Probate Judge/Clerk

7728    2013

All that parcel of real estate situate in Springfield Township, Hamilton County, Ohio, known and designated as Lot No. 16 in Gross and Dietrich's Subdivision on the plat of the Village of Glendale, Ohio, recorded in Plat Book 1, page 299 of the Hamilton County, Ohio, Records; said Lot No. 16 fronting One Hundred (100) feet on Church Avenue and running thence in a westerly direction Three Hundred and Four (304) feet and a fraction.

Being the same premises conveyed to Elaine Bender, William Tasio and Mary Tasio by deeds recorded in Deed Book 2963, page 275 and Deed Book 3301, page 638 of the Hamilton County, Ohio, Records, and the same premises conveyed to the grantors herein by deed executed the _____ 31st _____ day of _____ July _____, 1970.

DESCRIPTION ACCEPTABLE

Auditor

THIS LOAN PAID

MAR 1 5 1984

HOME STATE SAVINGS BANK

BOOK 3759 PAGE 452

7728 -2014

40/416

**GENERAL WARRANTY DEED**

853171

REBECCA PREM GROPPE
HAMILTON COUNTY RECORDER
Doc #:98 - 179495 Type: DE
Filed:09/23/1998 8:50:12 AM $ 14.00
Off.Rec.: 7762 S38 F H49 1 1.59

**DEED**

JANET WASHINGTON, UNMARRIED,
, of Hamilton County, Ohio , for valuable consideration paid, GRANT(S),
with general warranty covenants, to JANET WASHINGTON, UNMARRIED AND JONNA WASHINGTON, SINGLE
: FOR THEIR JOINT LIVES REMAINDER TO THE SURVIVORSHIP OF THEM

, whose tax mailing address is:
1045 Church Ave.
Cincinnati, Ohio 45246
the following Real Property: Situated in the County of Hamilton in the State of

Ohio and in the Cincinnati of Cincinnati
All that parcel of real estate situate in Springfield Township,
Hamilton County, Ohio, known and designated as Lot No. 16 in
Gross and Dietrich's Subdivision on the plat of the Village of
Glendal, Ohio, recorded in Plat Book 1, page 299 of the Hamilton
County, Ohio Records; said Lot No. 16 fronting one hundred (100)
feet on Church Avenue and running thence in a westerly
direction three hundred and four (304) feet and a fraction.

596 - 4 - 101

Examined & Compliance with Sec. 319.202 R.C. Conveyance
is exempt from fee under Sec. Sec. 319.54 (F) 3.

DUSTY RHODES
HAMILTON COUNTY, OHIO

DESCRIPTION ACCEPTABLE
Auditor

Prior Instrument Vol. Page Official Deed Records Hamilton
County, Ohio.
XXXXXXXXXXXXXXXXXXXXXXXXX Witness hand(s) this 12th day of
**August** .1998.
SIGNED AND ACKNOWLEDGED IN THE PRESENCE OF:

_(witness)_ _Janet Washington_
JANET WASHINGTON (grantor)

_(witness)_ _Jenn D Smith_

_____ (grantor)

STATE OF OHIO COUNTY OF Hamilton ss.
Be it Remembered, that on this 12th day of August ,1998 , before
me, the Subscriber, a Notary Public in and for said County, personally came, the GRANTOR(S)
JANET WASHINGTON

who acknowledged the signing of this DEED and that the signing was A voluntary act and deed for the uses
and purposes therein mentioned.
In testimony whereof, I have hereunto subscribed my name and affixed my seal on this day and
year aforesaid.

This instrument prepared by: THOMAS H. MONGAN

PATSY BUMGARDNER
Notary Public, State of Ohio
My Commission Expires Sept. 30, 2001

RECORDED
98 SEP 23 AM 8:41
DUSTY RHODES
AUDITOR
HAMILTON COUNTY OHIO

7762 PG 558

**DEED**

## AFFIDAVIT FOR TRANSFER TO SURVIVOR

Rebecca Groppe
Hamilton County Recorders Office
Doc #: 07-0159706 Type: AFF
Filed: 11/08/07 12:39:23 PM $36.00
Off.Rec.: 10696    02172    F  3      399

**STATE OF OHIO, COUNTY OF   CLERMONT   ) SS:**

>10696021727>

JONNA WASHINGTON, of 1723 Waltham Avenue, Cincinnati, Ohio 45239, being first duly sworn, deposes and says as follows: that she is a surviving daughter of JANET WASHINGTON, Deceased, who died on September 8th, 2007, and that at the time of the death of JANET WASHINGTON, she was a resident of 3801 Woodridge Boulevard, Fairfield, Ohio 45014.

Affiant further states that at the time of the death of the said JANET WASHINGTON, that she, JONNA WASHINGTON, was a joint owner of the following described parcel of real estate, to-wit:

### SEE LEGAL DESCRIPTION ON BACK

Affiant further states that the deed to the aforedescribed real estate granted ownership in said property to JANET WASHINGTON, unmarried, and JONNA WASHINGTON, unmarried, for their joint lives with remainder to the survivor of them, their heirs and assigns forever.

Affiant further states that a copy of the Certificate Of Death of JANET WASHINGTON, Deceased, is attached hereto and incorporated herein by reference.

Affiant further states that she makes this Affidavit pursuant to Ohio Revised Code Section 5302.17.

Affiant further sayeth naught.

_____
Jonna Washington,   Surviving Daughter

Sworn to before me and subscribed in my presence this  2ⁿᵈ  day of
November , 2007.

_____
Notary Public

EDWIN L. HOSELIS, JR. Attorney at Law
NOTARY PUBLIC, STATE OF OHIO
My Commission has no expiration
date, Section 147.03 O.R.C.

Convey. number:
Deed number:    141557
Instr. number:   144926
Transfer date:   11/08/2007

This instrument was prepared by Edwin L. Shoseles, Jr., Attorney At Law, 741 Milford Hills Drive, Milford, Ohio 45150-1446.  PH: (513) 248-0317
Hamilton County Auditor
Sales amount:    0
Conveyance fee:  0.00

1

10696   2172

_**LEGAL DESCRIPTION**_

Situated in the County of Hamilton, in the State of Ohio and in the City of Cincinnati:

All that parcel of real estate situate in Springfield Township, Hamilton County, Ohio, known and designated as Lot No. 16 in Gross and Dietrich's Subdivision on the plat of the Village of Glendale, Ohio, recorded in Plat Book 1, Page 299 of the Hamilton County, Ohio, records; said Lot No. 16 is fronting one-hundred (100) feet on Church Avenue and running thence in a westerly direction three hundred and four (304) feet and a fraction.

_**SUBJECT TO**_ all legal highways, easements, restrictions, reservations and covenants of record, if any.

DESCRIPTION ACCEPTABLE

Auditor

Deed Reference of:        Official Records Book 7762, Page 558

Property Address:         1045 Church Avenue, Cincinnati, Ohio 45246

Auditor's Parcel No:      596-0004-0101-00

10696  2173

2

VERIFY PRESENCE OF ODH WATERMARK    HOLD TO LIGHT TO VIEW

Ohio Department of Health
VITAL STATISTICS
**CERTIFICATE OF DEATH**
Type or print in permanent blue or black ink

Reg. Dist. No.    09
Primary Reg. Dist. No.    0903

Registrar's No. 2007-000920

State File No.

| 1. Decedent's Legal Name (Include AKA's if any) (First, Middle, LAST, Suffix) JANET BERENICE WASHINGTON | 2. Sex Female | 3. Date of Death (Mo/Day/Year) September 08, 2007 |

| 4. Social Security Number | 5a. Age (Years) 78 | 5b. Under 1 Year Months Days | 5c. Under 1 Day Hours Minutes | 6. Date of Birth (Mo/Day/Year) March 18, 1929 | 7. Birthplace (City and State or Foreign Country) NEW RICHMOND, OHIO |

| 8a. Residence State OHIO | 8b. County BUTLER | 8c. City or Town FAIRFIELD |
| 8d. Street and Number 3801 Woodridge Boulevard | 8e. Apt. No. | 8f. Zipcode 45014 | 8g. Inside City Limits? Yes |

| 9. Ever in US Armed Forces? No | 10. Marital Status at Time of Death Widowed (and not remarried) | 11. Surviving Spouse's Name (if wife, give name prior to first marriage) |

| 12. Decedent's Education 8TH GRADE OR LESS | 13. Decedent's Hispanic Origin No | 14. Decedent's Race Black |

| 15. Father's Name BALLARD LAMB | 16. Mother's Name (Give name prior to first marriage) MABEL GRAHAM |

| 17a. Informant's Name JONNA WASHINGTON | 17b. Relationship to Decedent Daughter | 17c. Mailing Address (Street and number, City, State, Zip Code) 1723 Waltham Avenue CINCINNATI, OHIO 45239 |

| 18a. Place of Death Nursing Home/Long Term Care Facility | 18b. City or Town, State and Zip Code FAIRFIELD, OH 45014 | 18c. Name of Facility (if not Institution, give Street & Number) MANORCARE HEALTH SERVICES | 18d. County BUTLER |

| 19. Signature of Funeral Service Licensee or Other Agent Jon P. Patterson | 20. License Number (of licensee) 007322 | 21. Name and Complete Address of Funeral Facility THOMPSON, HALL & JORDAN FUNERAL HOME 11400 WINTON RD FOREST PARK, OH 45240 |
| 22a. Method of Disposition Burial | 22b. Date of Disposition September 14, 2007 |
| 22c. Place of Disposition (Name of Cemetery, Crematory, or other place) Oak Hill Cemetery | 22d. Location (City/Town or State) CINCINNATI, OH |

| 23. Registrar's Signature Patricia Burg | 24. Date Filed October 11, 2007 |

| 25a. Name of Person Issuing Burial Permit BURG, PATRICIA | 25b. District No. 0900 | 25c. Date Burial Permit Issued September 12, 2007 |

| 26a. Certifier (Check only one) ☒ Certifying Physician On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated. ☐ Coroner On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated. | 26b. Time of Death 2:30 AM | 26c. Date Pronounced Dead (Mo/Day/Year) 9/8/07 | 26d. Was case referred to coroner? No |
| 26e. Signature and Title of Certifier Syed Moqeeth | 26f. License number 35.067595 | 26g. Date Signed 10/12/07 |

| 27. Name (Last, First, Middle) and Address of Person who Completed Cause of Death MOQEETH, SYED ABDUL, 613 OHIO ST, CINCINNATI, OHIO 45 226 |

| 28. Part I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line. Type or print in permanent blue or black ink. | | Approximate Interval Between Onset and Death |
| Immediate Cause (Final disease or condition resulting in death) | 1. MYOCARDIAL INFARCTION | < 8 HOURS |
| Sequentially list conditions, if any, leading to immediate cause. Enter Underlying Cause (Disease or injury that initiated events resulting in death) last. | Due to (or as a Consequence of) 2. CORONARY HEART DISEASE | |
| | Due to (or as a Consequence of) 3. | |
| | Due to (or as a Consequence of) 4. | |

| Part II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. 1. HTN | 29a. Was An Autopsy Performed? N | 29b. Were Autopsy Findings Available Prior To Completion Of Cause of Death? |

| 30. Did Tobacco Use Contribute to Death? DON'T KNOW | 31. If Female, Pregnancy Status N/A | 32. Manner of Death Natural |

| 33a. Date of Injury (Mo/Day/Year) | 33b. Time of Injury | 33c. Place of Injury (e.g., Decedent's home, construction site, restaurant, wooded area) | 33d. Injury at Work? |
| 33e. Location of Injury (Street and Number or Rural Route Number, City or Town, State) | | | |
| 33f. Describe How Injury Occurred: | 33g. If Transportation Injury, Specify: | |

HEA 3726   Rev. 01/07

I HEREBY CERTIFY THIS
DOCUMENT IS AN EXACT
COPY OF THE RECORD ON FILE WITH
THE OHIO DEPARTMENT OF HEALTH.

OC 1101007846

Patricia F. Burg
PATRICIA F. BURG, LOCAL REGISTRAR
OFFICE OF VITAL STATISTICS
WITNESS MY SIGNATURE & SEAL

10696   2-74

VERIFY PRESENCE OF ODH WATERMARK    HOLD TO LIGHT TO VIEW

POWER OF ATTY

# STATE OF OHIO
## GENERAL DURABLE POWER OF ATTORNEY

I, Janet Washington, residing at 3801 Woodridge Boulevard, Fairfield, Ohio 45014, hereby appoint my daughter, Jonna Washington, as my Attorney-in-Fact, (Agent). Should Jonna Washington not be immediately available, or be unwilling or unable to serve as my Agent, then I name my granddaughter, Jessica Long, as my alternate/successor Agent:

I hereby revoke all general powers of attorney that I have previously signed. However, the preceding sentence shall not have the effect of revoking any durable power of attorney for health care I may previously have signed.

My Agent shall have full power and authority to act on my behalf. This power and authority shall authorize my Agent to manage and conduct all of my affairs and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future. My Agent's powers shall include, but not be limited to, the power to:

1. Open, maintain or close bank accounts (including, but not limited to, checking accounts, savings accounts, and certificates of deposit), brokerage accounts, and other similar accounts with financial institutions.

    a. Conduct any business with any banking or financial institution with respect to any of my accounts, including, but not limited to, making deposits and withdrawals, obtaining bank statements, passbooks, drafts, money orders, warrants, and certificates or vouchers payable to me by any person, firm, corporation or political entity.

    b. Perform any act necessary to deposit, negotiate, sell or transfer any note, security, or draft of the United States of America, including U.S. Treasury Securities.

    c. Have access to any safe deposit box that I might own, including its contents, and to obtain a safe deposit box if deemed necessary.

2. Sell, exchange, buy, invest, or reinvest any assets or property owned by me. Such assets or property may include income producing or non-income producing assets and property.

3. Sell, convey, lease, mortgage, manage, insure, improve, repair, or perform any other act with respect to any of my property, (now owned or later acquired), including, but not limited to, real estate and real estate rights.

4. Purchase and/or maintain insurance, including life insurance upon my life or the life of any other appropriate person.

Rebecca Roan Groppe
Butler County Recorder's Office
Doc #: 07-0037944 Type: PA
Filed: 03/16/07 11:52:04 AM $52.00
Off.Rec.: 10498  01110  F  5  250

10498  1110

Page 1

b1049801110Fb

5. Take any and all legal steps necessary to collect any amount or debt owed to me, or to settle any claim, whether made against me or asserted on my behalf against any other person or entity.

6. Enter into binding contracts on my behalf.

7. Exercise all stock rights on my behalf as my proxy, including all rights with respect to stocks, bonds, debentures, or other investments.

8. Employ professional and business assistance as may be appropriate, including attorneys, accountants, and real estate agents.

9. Prepare, sign, and file documents with any governmental body or agency.

10. Obtain information or documents from any government or its agencies, and negotiate, compromise, or settle any matter with such government or agency (including tax matters).

11. Prepare applications, provide information, and perform any other act reasonably requested by any government or its agencies concerning governmental benefits.

12. Make gifts from my assets to members of my family and to such other persons or charitable organizations with whom I have an established pattern of giving.

13. Disclaim any interest that might otherwise be transferred or distributed to me from any other person, estate, trust, or other entity, as may be appropriate.

This Power of Attorney shall be construed broadly as a General Power of Attorney. The listing of specific powers is not intended to limit or restrict the general powers granted in this Power of Attorney in any manner. However, any power or authority granted to my Agent under this document shall be limited to the extent necessary to prevent this Power of Attorney from causing my income to be taxable to my Agent.

My Agent shall not be liable for any loss that results from a judgment error that was made in good faith. However, my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney.

I authorize my Agent to indemnify and hold harmless any third party that accepts and acts under this document. My Agent shall be entitled to reimbursement of all reasonable expenses incurred in connection with this Power of Attorney. My Agent shall promptly reimburse any party who has incurred, or may in the future incur, expenses on my behalf.

I nominate my Agent to be the guardian of my person, estate, or both. This nomination is for consideration by a court if proceedings for the appointment of a guardian for my person,

10498    1111

estate, or both, are initiated. I also authorize my Agent to nominate a successor guardian for consideration by a court. I direct that bond be waived for my Agent serving as guardian, or for the nominated successor guardian, if applicable.

My Agent shall provide an accounting for all funds handled and all acts performed as my Agent, if I so request or if such a request is made by any authorized personal representative, executor/executrix or fiduciary acting on my behalf or on behalf of my estate.

This General Durable Power of Attorney shall become effective immediately, and shall not be affected by my disability or lapse of time. I may revoke this Power of Attorney at any time, while I am competent, by providing written notice to my Agent. The authority of my Agent is exercisable as provided in this power of attorney notwithstanding my suffering any disability, incapacity, or being adjudged incompetent. The Grant of this Power of Attorney to my Agent shall pass automatically to my alternate/successor Agent upon the Agent's substantial disability, death or resignation as Agent. My Agent may resign by providing written notice to me along with a copy of the resignation to a court of competent jurisdiction.

This instrument is executed in the state of Ohio, and the laws of Ohio shall govern all questions as to the validity of this power of attorney and the construction of its provisions. It is my intention, however, that this power of attorney be exercisable in any other state or jurisdiction in which I may at any time have property, business, or other dealings. Should any provision or power in this document not be enforceable, such enforceability shall not affect the enforceability of the rest of this document. Gender, singular or plural shall be interpreted as the context requires. I agree that a photocopy of this power of attorney is as valid as the original.

I acknowledged my signing of this power of attorney in the presence of two witnesses, who attested to the signing and subscribed their names to the attestation. I also acknowledged my signing of this power of attorney before a notary public who certified the acknowledgment and subscribed his name to the certificate of the acknowledgment. I did this with the intent of facilitating any statutorily required recordings and/or filings of this Power of Attorney, as it may relate to the use of this Power of Attorney for the appointment of a guardian, the transfer of personal property, or the transaction of business relating thereto. With this Power of Attorney so executed, acknowledged, and recorded, a copy of the record thereof, certified by the county recorder, with his official seal affixed thereto, shall be received in all courts and places within

10498  1112

this state as prima-facie evidence of the existence of such instrument and as conclusive evidence of the existence of such record.

Dated this 8th day of February 2007, at Fairfield, Ohio.

_Janet Washington_ _____
Janet Washington

    I attest that Janet Washington signed or acknowledged this General Durable Power of Attorney in my presence, that Janet Washington appears to be of sound mind and not under or subject to duress, fraud, or undue influence. I further attest that I am not the Agent designated in this document.

Witness signature: _____     Witness signature: _____

Print name: _Bonnie Bell_     Print name: _Albert J. Girdis_

Address: _Woodridge Blvd._     Address: _35634 Enterprise_
_Fairfield, OH 45014_     _Circle, Cinti, OH 45252_

Date: _2/8/07_     Date: _2/8/07_

State of Ohio     }

County of Butler     }

    On this 8th day of February 2007, I, a Notary Public in the State of Ohio, certify that before me personally appeared Janet Washington, and who I am satisfied is the person named in, and who executed the within four-page Power of Attorney, and who acknowledged under oath, and to my satisfaction, that the execution of the Power of Attorney was done voluntarily for the uses and purposes therein expressed. I attest that Janet Washington appeared to be of sound mind and not under or subject to duress, fraud, or undue influence. The execution of this Power of Attorney by Janet Washington was done in my presence and in the presence of both witnesses above, each of whom signed their names in my presence, and in the presence of Janet Washington.

_____
Notary Public

My Commission Expires: _NEVER_

RICK JOSEPH SOMMER, Attorney at Law
Notary Public, State of Ohio
My Commission has no expiration date.
Section 147.03

10498    1113

Page 1 of 2



## GENERAL WARRANTY DEED

853171

REBECCA PREN GROPPE
HAMILTON COUNTY RECORDER
Doc #:58 - 179495 Type: DE
Filed:09/23/1998 8:50:12 AM  $ 1.00
Off.Rec.: 7762  558 F  M49  1 .59

JANET WASHINGTON, UNMARRIED
, of Hamilton          County, Ohio          , for valuable consideration paid, GRANT(S),
with general warranty covenants, to    JANET WASHINGTON, UNMARRIED AND JONNA WASHINGTON, SINGLE
: FOR THEIR JOINT LIVES REMAINDER TO THE SURVIVORSHIP OF THEM

, whose tax mailing address is:
1045 Church Ave.
Cincinnati, Ohio 45246
the following Real Property: Situated in the County of   Hamilton                          in the State of

Ohio and in the  Cincinnati          of   Cincinnati
        All that parcel of real estate situate in Springfield Township,
Hamilton County, Ohio, known and designated as Lot No. 16 in
Gross and Dietrich's Subdivision on the plat of the Village of
Glendal, Ohio, recorded in Plat Book 1, page 299 of the Hamilton
County, Ohio Records; said Lot No. 16 fronting one hundred (100)
feet on Church Avenue and running thence in a westerly
direction three Hundred and four (304) feet and a fraction.

596 - 4 - 101

Examined & Compliance with Sec. 319.202 R.C. Conveyances
is exempt from tax under Sec. Sec. 319.54 (F) 3.

DUSTY RHODES
HAMILTON COUNTY, OHIO

DESCRIPTION ACCEPTABLE

        Prior Instrument        Vol.        Page        Official Deed Records  Hamilton
County, Ohio.
xxxxxxxxxxxxxxxxxxxxxxxxxxx Witness        hand(s) this 12th        day of
August        1998
SIGNED AND ACKNOWLEDGED IN THE PRESENCE OF:

(witness)                                Janet Washington
                                        JANET WASHINGTON        (grantor)

(witness)                                                (grantor)

STATE OF OHIO            COUNTY OF  Hamilton              ss.
        Be it Remembered, that on this 12th    day of  August        1998    before
me, the Subscriber, a   Notary Public      in and for said County, personally came, the GRANTOR(S)
        JANET WASHINGTON

who acknowledged the signing of this DEED and that the signing was      A     voluntary act and deed for the uses
and purposes therein mentioned.
        In testimony whereof, I have hereunto subscribed my name and affixed my seal on this day and

year aforesaid.

This instrument prepared by:   THOMAS H. MONGAN

RUSY BUMGARDNER
Notary Public, State of Ohio
My Commission Expires Sept 28, 2001

7762rc 558          10498          1114

# NOTE

EXHIBIT

**B**

June 13th, 2002                    CINCINNATI                    OHIO
[Date]                              [City]                      [State]

1045 CHURCH AVE, CINCINNATI, OHIO  45246

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $      101,000.00  (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is       Safeway Mortgage

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      7.375  %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st      day of each month beginning on August 1st, 2002      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  July 1st, 2032      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at       260 Northland Blvd., Cincinnati, OH 45246
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $      697.59

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N (0005).01          Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                    Initials: ___

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000        % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

ELECTRONICALLY FILED 05/20/2013 13:07  /  IFFO  /  A 1303699  /  CONFIRMATION NUMBER 250932

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
JANET WASHINGTON      -Borrower                      -Borrower

_____ (Seal)      _____ (Seal)
                        -Borrower                      -Borrower

_____ (Seal)      _____ (Seal)
                        -Borrower                      -Borrower

_____ (Seal)      _____ (Seal)
                        -Borrower                      -Borrower

Pay to the order of  FLAGSTAR BANK, F.S.B. Final Doc.Dept MS W-530-3
without recourse.
This_____ day of_____

*[Sign Original Only]*

Dan Godsey, Manager
Safeway Mortgage
260 Northland Blvd.
Cincinnati, OH 45246

-5N (0005).01               Page 3 of 3             Form 3200 1/01

PAY TO THE ORDER OF
FLAGSTAR BANK, FSB
WITHOUT RECOURSE

SAFEWAY MORTGAGE

BY: FLAGSTAR BANK, FSB ITS ATTORNEY IN FACT

U/P/A DATED 2-18-02

BY: _____
CHUCK SCHATZLEY, VICE PRESIDENT

PAY TO THE ORDER OF
WITHOUT RECOURSE
FLAGSTAR BANK, FSB

BY: _____
JOAN A. GEORGE, SENIOR VICE PRESIDENT

BY: _____
JOHN P. BARECKI, FIRST VICE PRESIDENT



EXHIBIT

C

tabbies

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Everbank
301 West Bay Street
Jacksonville, Florida 32202

        Plaintiff

   vs.

Jonna Washington
1045 Church Avenue
Cincinnati, OH 45246

Unknown Spouse (if any) of Jonna
Washington
1045 Church Avenue
Cincinnati, OH 45246

People Working Cooperatively, Inc., an
Ohio non-for-profit Corporation
c/o Jock J Pitts, as Registered Agent
1212 Tennessee Avenue
Cincinnati, OH 45229

Manorcare Inc., dba Heartland of
Woodridge
c/o Manor Care Of Akron Oh, LLC, as
Registered Agent
333 North Summit Street
Toledo, OH 43604

State of Ohio, Department of Taxation
c/o Ohio Attorney General
150 East Gay Street
21st Floor
Columbus, OH 43215

       Defendants.

Case No.

Judge

**COMPLAINT FOR FORECLOSURE**

13-013548_SPK2

C2

ELECTRONICALLY FILED 05/20/2013 13:07 / IFFO / A 1303699 / CONFIRMATION NUMBER 250932

## Background

1.  Janet Washington executed the promissory note (the "Note") that is the subject of this action. See the attached exhibit.

2.  Attached hereto as an exhibit is a copy of the mortgage (the "Mortgage") that was validly executed in connection with the execution of the Note. The parties to the Mortgage intended that it attach to the entire fee simple interest in the property.

3.  The Mortgage was recorded July 16, 2002 as Official Records Volume 8966, Page 3848, Hamilton County, Ohio records.

4.  The Mortgage is a lien on the property (the "Property") described more fully in the attached Mortgage.

5.  The Note and Mortgage are in default. Plaintiff has satisfied all conditions precedent and has declared the entire balance due and payable.

## COUNT ONE

6.  Plaintiff incorporates each of the preceding allegations into Count One by reference.

7.  Janet Washington is deceased. As a result, Plaintiff is not seeking a personal judgment against the foregoing defendant but is seeking instead to enforce its security interest. Because the Note has been accelerated and is in default, Plaintiff is entitled to recover from the sale of the Property the principal in the amount of $99,198.86, plus interest on the outstanding principal balance at the rate of 7.375% per annum from January 1, 2013, plus late charges and advances and all costs and expenses incurred for the enforcement of the Note and Mortgage, except to the extent the payment is prohibited by Ohio law.

8.  Plaintiff is a person entitled to enforce the Note, pursuant to Section 1303.31 of the Ohio Revised Code, and the Mortgage was given to secure the Note.

13-013548_SPK2

## COUNT TWO

9.  Plaintiff incorporates each of the preceding allegations into Count Two by reference.

10. The Mortgage is a valid and subsisting lien on the Property, subject only to any lien that may be held by the County Treasurer that has priority over the Mortgage as a matter of law.

11. By reason of default, Plaintiff is entitled to a decree foreclosing the Mortgage.

12. The Preliminary Judicial Report attached to this Complaint as an exhibit refers to other persons, if any, who are named as defendants in this action. Said other persons are named as defendants in this action solely because they may have or claim an interest in the Property.

## PRAYER FOR RELIEF

13. Plaintiff prays for the following relief:

    * a finding of default on the note in the amount of $99,198.86, plus interest on the outstanding principal balance at the rate of 7.375% per annum from January 1, 2013, plus late charges and advances and all costs and expenses incurred for the enforcement of the Note and Mortgage except to the extent the payment is prohibited by Ohio law;

    * a finding that the Mortgage is a valid and subsisting lien on the Property, subject only to any lien that may be held by the County Treasurer that has priority over the Mortgage as a matter of law;

    * an order (1) foreclosing the equity of redemption and dower of all defendants named in this action, (2) requiring that the Property be sold free and clear of all liens, interests, and dower, (3) requiring all defendants to set up their liens or

13-013548_SPK2

interest in the Property or be forever barred from asserting such liens or interests,
(4) requiring that the proceeds of the sale of the Property be applied to pay all
amounts due Plaintiff, and (5) granting Plaintiff all other relief, legal and
equitable, as may be proper and necessary, including, for example, a writ of
possession.

Respectfully submitted,

Lynn A. Busch-Heyman (0080593)
John R. Cummins (0036811)
Nicholas M. Smith (0076848)
Gail C. Hersh, Jr. (0058654)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH 43216-5028
Telephone: 614-222-4921
Fax: 614-220-5613
Email: lab@manleydeas.com
Attorney for Plaintiff

*Please note:  The documents attached hereto may have been redacted to remove personal information and
personal identifiers, such as financial account information, social security numbers, dates of birth, and
similar information to further protect the privacy of borrowers and mortgagors.

13-013548_SPK2

relationships that work

# green tree

Green Tree Servicing LLC
P.O. Box 6172
Rapid City, SD 57709-6172

July 03, 2014

JANET WASHINGTON
1045 CHURCH AVE
CINCINNATI OH 45246-4311

**EXHIBIT**
**D**

Re: Green Tree Servicing LLC ("Green Tree")
Account Number:

Dear JANET WASHINGTON:

Congratulations! You were approved for an account modification Trial Period Plan. While your account has been approved for a modification Trial Period Plan, Green Tree is required to advise you of any other account modification programs for which you were reviewed.

You were evaluated for mortgage payment assistance based upon the eligibility requirements of Fannie Mae, the owner of your mortgage account. You must meet the program eligibility requirements of Fannie Mae to be eligible for a modification Trial Period Plan. Based on a careful review of your financial circumstances determined by the information you provided to us, you were found not to be eligible for the following account modification program(s):

N/A

You were found to be ineligible for the above-referenced program for the following reason(s):

- N/A

Because you were approved for a loss mitigation option, your account was not reviewed for any option(s) ranked below the one for which you were approved. You were not reviewed for the following program(s):

- FNMA MOD 24

- FNMA Cap & Extend Modification

- FNMA Standard Modification

You have the right to appeal this loss mitigation decision. If you would like to appeal, you must contact us within 14 calendar days from the date of this notice and state you are requesting an appeal of this decision. For appeals requested in writing, you must include your name, property address and mortgage account number. You may also specify the reasons for your appeal and provide any supporting documentation. Your right to appeal expires 14 calendar days from the date of this notice. Any appeal requests or documentation received after that date may not be considered. Please contact us Monday – Friday 8 a.m. to 4 p.m. MST at 1-855-858-3873, or at the below-referenced mailing address and fax number.

Green Tree Servicing LLC
PO Box 6172
Mail Stop R299
Rapid City, SD 57709
Fax: 1-855-895-4481

If you elect to appeal, we will provide you a written notice of our appeal decision within 30 calendar days of receiving your appeal. Our appeal decision is final and not subject to further appeal.

If you elect to appeal, you do not have to accept this current loss mitigation offer. If you wait to accept the current offer until after receiving our appeal decision, your account will become more delinquent. Any unpaid interest, and other unpaid amounts, such as escrows for taxes and insurance, will continue to accrue on your mortgage account during the appeal. In that event, the payment amounts and due dates described within this letter may be adjusted or the amounts

CFPB Waterfall Denial For Approved TPP Letter - GSE, 01/10/2014        YACWGZ04 1.0

will be added to the balance of your account if permitted by applicable law.

It is your responsibility to contact Green Tree to discuss your above-referenced account. If you wish to explore your options or have any other questions, please contact your account representative. Your assigned account representative is Anita S. at 1-800-643-0202, extension 69961.

Our credit decision may have been based in part upon information obtained in a report from the below-referenced consumer reporting agency listed. You have the right under the Fair Credit Reporting Act to obtain a free copy of your credit report. You must request your free copy within 60 days of the date of this letter. You also have the right to dispute the information contained in your credit report with the credit reporting agency. The credit reporting agency did not make the decision regarding your ineligibility and is not able to provide you with specific reasons as to why you are not eligible for a Loan Modification.

| | |
|---|---|
| Credit Reporting Agency: | Trans Union Consumer Solutions |
| Reporting Agency Address: | P.O. Box 2000<br>Chester, PA 19022-2000 |
| Toll Free Number: | 1-800-916-8800 |
| Web Address: | http://annualcreditreport.transunion.com/entry/disputeonline |

We also obtained your credit score from this consumer reporting agency and used it in making our credit decision. Your credit score is a number that reflects the information in your consumer report. Your credit score can change, depending on how the information in your consumer report changes.

Your credit score: No credit score was available from the consumer reporting agency.

Date: N/A

Scores range from a low of 300 to a high of 850

Key factors that adversely affected your credit score:

* No key factors were available from the consumer reporting agency.

If you have any questions regarding your credit score, you should contact Trans Union Consumer Solutions at:

Address: P.O. Box 2000, Chester, PA 19022-2000          Telephone number: 1-800-916-8800

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the Federal Trade Commission, which can be contacted at:

Federal Trade Commission
Equal Credit Opportunity
Washington, DC 20580

Counseling is available at no charge from HUD-approved counselors through the HOPE Hotline: 1-888-995-HOPE. This housing counseling on-demand service is available 24-hours a day/7-days a week in Spanish and English (other languages available on request). You may also visit http://www.hud.gov/offices/hsg/sfh/hcc/fc/.

If you have concerns about the evaluation of your mortgage for loss mitigation alternatives, then please contact Anita S. at 1-800-643-0202, extension 69961; Green Tree has designated the following address where mortgage loan customers must send any Qualified Written Request, Notice of Error, or Request for Information: PO Box 6176 Rapid City SD 57709-6176.

Sincerely,

Green Tree
1-800-643-0202
Monday - Friday 7 a.m. to 8 p.m., and Saturday 7 a.m. to 1 p.m. CST

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used

for that purpose.

NOTICE TO OHIO RESIDENTS

The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.





Green Tree Servicing LLC
P.O. Box 6172
Rapid City, SD 57709-6172

+ 0501004 000012717 096C32 - 0926129
JANET WASHINGTON
1045 CHURCH AVE
CINCINNATI OH 45246-4311



**HELP FOR AMERICA'S HOMEOWNERS.**

MAKING HOME AFFORDABLE℠



relationships that work

# green tree®

*You may be able to make your payments more affordable.*
*Act now to get the help you need!*

July 03, 2014

Green Tree Servicing LLC
P.O. Box 6172
Rapid City, SD 57709-6172

JANET WASHINGTON
1045 CHURCH AVE
CINCINNATI OH 45246-4311



Re: Green Tree Servicing LLC ("Green Tree")
Account Number:
Property Address:  1045 CHURCH AVE
CINCINNATI, OH  45246

Dear JANET WASHINGTON:

**Congratulations!**  You are approved to enter into a trial period plan under the Home Affordable Modification Program.  This is the first step towards qualifying for a more affordable mortgage payment.  Please read this letter so that you understand all the steps you need to take to modify your mortgage payments.

**What you need to do...**
To accept this offer, you must make your first monthly "trial period payment."  To qualify for a permanent modification, you must make the following trial period payments in a timely manner:

| | |
|---|---|
| 1st payment: | $830.38 by 08/01/2014 |
| 2nd payment: | $830.38 by 09/01/2014 |
| 3rd payment: | $830.38 by 10/01/2014 |

After all trial period payments are timely made and you have met all of the applicable qualification requirements, your mortgage will then be permanently modified.  (Your existing loan and loan requirements remain in effect and unchanged during the trial period.)  **If each payment is not received by Green Tree in the month in which it is due, this offer will end and your loan will not be modified under the terms described in this offer.**

If you have any questions or if you cannot afford the trial period payments shown above but want to keep your property, or if you have decided to leave your property but still want to avoid foreclosure, please call us at 1-800-643-0202  as we may be able to help you.  (Also, please review the attached "Frequently Asked Questions".)

HAMP Trial Period Plan-Verified, 02/25/2014          YAHMPZ04    1.6                                    LTR-632

Green Tree has designated the following address where mortgage loan customers must send any Qualified Written Request, Notice of Error, or Request for Information: PO Box 6176 Rapid City SD 57709-6176.

Sincerely,

Green Tree
1-800-643-0202
Monday - Friday 7 a.m. to 8 p.m., and Saturday 7 a.m. to 1 p.m. CST

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose.

If you have any additional questions, please contact your Green Tree account representative Anita S. at 1-800-643-0202, extension 69961, Monday - Friday 7 a.m. to 8 p.m., and Saturday 7 a.m. to 1 p.m. CST.

Attachments: (1) Frequently Asked Questions and (2) Additional Trial Period Plan Information and Legal Notices.

The *Making Home Affordable Program* was created to help millions of homeowners refinance or modify their mortgages. As part of this program, we - your mortgage servicer - and the Federal Government are working to offer you options to help you stay in your home.



**FREQUENTLY ASKED QUESTIONS** · Get the answers you need to some of the most common questions.

**Q. What else should I know about this offer?**

- If you make your new payments timely, **we will not conduct a foreclosure sale.**
- You will not be charged any fees for this trial period plan or a permanent modification.
- If your loan is modified, we will waive all unpaid late charges.
- Your credit score may be adversely affected by accepting a trial period plan. The impact of a permanent modification on a credit score depends on the homeowner's entire credit profile. For more information about your credit score, go to http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.
- You may be required to attend credit counseling.

**Q. Why is there a trial period?**

The trial period offers you immediate payment relief and gives you time to make sure you can manage the lower monthly mortgage payment. The trial period is temporary, and your existing loan and loan requirements remain in effect and unchanged during the trial period.

**Q. How was my new payment in the trial period determined?**

Your trial period payment is approximately 31% of your total gross monthly income, which we determined to be $2,676.27 based upon the income documentation you provided. If the loan is successfully modified, your new payment also will be based on 31% of your gross income. In addition, if your existing payment includes mortgage insurance premiums, this amount will also be added to your payment. If we were able to permanently modify your loan today, we estimate your modified interest rate would be 2.00000%. Your final modified interest rate may be different.

The modified payment should be sufficient to pay the principal and interest as well as property taxes, insurance premiums and other permissible escrow fees based on our recent analysis of these costs. Your modified monthly payment may change if your property taxes and insurance premiums change. If you did not have an escrow account before, the timing of your tax and insurance bills may require that you make a payment to cover any such bills when they come due. This is known as an escrow shortage. Your loan has an escrow shortage of $409.43; this can either be paid in a lump sum when the loan is modified or over the next 60 months in an amount of $6.82 per month in addition to your modified monthly mortgage payment. If you wish to pay the total shortage as a lump sum, please contact us at 1-800-643-0202.

**Q. When will I know if my loan can be modified permanently and how will the modified loan balance be determined?**

Once you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modified loan. Any difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents. While this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment as that is determined based on your total monthly gross income, not your loan balance.

**Q. Are there incentives that I may qualify for if I am current with my new payments?**

Once your loan is modified, you can earn a pay-for-success incentive for every month that you make on-time payments beginning with the trial period payments. Depending on your modified monthly payment, you may accrue up to $1,000 each year for five years for a total of $5,000. This important benefit, *which will be applied to your principal balance each year after the anniversary date of your first trial period payment due date*, will help you earn equity in your home by reducing the amount that you owe. However, you must remain current on your loan. You will lose this benefit if your modified loan loses good standing, which means that the equivalent of three full monthly payments are due and unpaid on the last day of any month, at any time during this five year period. If you lose this benefit, you will lose all accrued, unapplied incentive payments.



**Q. Will my interest rate and principal and interest payment be fixed after my loan is permanently modified?**

Once your loan is modified, your interest rate and monthly principal and interest payment will be fixed for the life of your mortgage **unless** your initial modified interest rate is below current market interest rates. In that case, the below market interest rate will be fixed for five years. At the end of the fifth year, your interest rate may increase by 1% per year until it reaches a cap. The cap will equal the market rate of interest being charged by mortgage lenders on the day your modification agreement is prepared (the Freddie Mac Primary Mortgage Market Survey Rate for 30-year, fixed-rate conforming mortgages). Once your interest rate reaches the cap it will be fixed for the remaining life of your loan. Your new monthly payment will also include an escrow for property taxes, hazard insurance and other escrowed expenses. If the cost of your homeowners insurance, property tax assessment or other escrowed expenses increases, your monthly payment will increase as well.

**Q. What if I have other questions about Home Affordable Modification that cannot be answered by my mortgage servicer?**

Call the Homeowner's HOPE™ Hotline at **1-888-995-HOPE (4673)**. This Hotline can help with questions about the program and offers access to free HUD-certified counseling services in English and Spanish.



**Q. What if I am aware of fraud, waste, mismanagement or misrepresentations affiliated with the Troubled Asset Relief Program?**

Please contact SIGTARP at 1-877-SIG-2009 (toll-free), 1-202-622-4559 (fax) or www.sigtarp.gov and provide them with your name, our name as your servicer, your property address, loan number and reason for escalation. Mail can be sent to: Hotline Office of the Special Inspector General for Troubled Asset Relief Program, 1801 L Street NW, Washington, DC 20220.



### Additional Trial Period Plan Information and Legal Notices

The terms of your trial period plan below are effective on the day you make your first trial period payment, provided you have paid it on or before August 1, 2014. You and we agree that:

**We will not proceed to foreclosure sale during the trial period, provided you are complying with the terms of the trial period plan:**

* Any pending foreclosure action or proceeding that has been suspended may be resumed if you are notified in writing that you failed to comply with the terms of the trial period plan or do not qualify for a permanent modification.

* You agree that Green Tree will hold the trial period payments in an account until sufficient funds are in the account to pay your oldest delinquent monthly payment. You also agree that Green Tree will not pay you interest on the amounts held in the account. If any money is left in this account at the end of the trial period plan, those funds will be deducted from amounts that would otherwise be added to your modified principal balance.

* Green Tree's acceptance and posting of your new payment during the trial period will not be deemed a waiver of the acceleration of your loan (or foreclosure actions) and related activities, and shall not constitute a cure of your default under your loan unless such payments are sufficient to completely cure your entire default under your loan.

**If your monthly payment did not include escrows for taxes and insurance, you are now required to do so:**

* You agree that any prior waiver that allowed you to pay directly for taxes and insurance is revoked. You agree to establish an escrow account and to pay required escrows into that account.

**Your current loan documents remain in effect; however, you may make the trial period payment instead of the payment required under your loan documents:**

* You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the trial period plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

relationships that work

# green tree

Green Tree Servicing LLC
P.O. Box 6172
Rapid City, SD 57709-6172

January 23, 2015

JANET WASHINGTON
1045 CHURCH AVE
CINCINNATI OH 45246-4311

**EXHIBIT**

**F**

Re: Green Tree Servicing LLC ("Green Tree")
Account Number:
Property Address: 1045 CHURCH AVE
CINCINNATI, OH 45246

Dear JANET WASHINGTON:

Green Tree recently received your application for loss mitigation assistance for the above-referenced account. Unfortunately, Green Tree has determined your application is incomplete because we have not received all of the documentation necessary to complete the evaluation.

As of 01/23/2015, Green Tree has not received the following documentation:

• Uniform Borrower Assistance Form/RMA (signed)
• IRS 4506-T or 4506T-EZ Form (signed)
• Most Recent Utility Bill
• Most Recent Pay Stubs Reflecting the Most Recent 30-Day's Earnings
• Signed and Dated Quarterly or Year-to-Date Profit Loss Statement
• Recorded Quit Claim Deed or Warranty Deed
• Non-Borrower Income Contribution
• Non-Borrower Credit Authorization Form

Please submit the missing items to Green Tree at the following address or fax number:

Green Tree
Attn: Loss Mitigation, T214
7360 South Kyrene Road
Tempe, AZ 85283
(877) 612-2422

It is your responsibility to send in the above-referenced documentation by 02/22/2015. If all missing documentation is not received within the aforementioned time frame, there is no guarantee your account will be evaluated. While your application remains incomplete foreclosure proceedings may continue, including referral to foreclosure if the account was not previously referred to foreclosure.

After receiving a complete loss mitigation application, the evaluation process may take up to 30 days. If your application is approved, your account representative will notify you to discuss the loss mitigation option(s) for which you are eligible. If your application is denied, you will receive a letter stating the reason for denial. You may continue to receive collection notices.

If your account was previously referred to foreclosure, we may continue the foreclosure process while we evaluate your account for a loss mitigation option, if allowed by State or Federal law. However, as long as a complete application is received more than 37 days prior to foreclosure sale, no foreclosure sale will be conducted and you will not lose your home if Green Tree is reviewing a complete loss mitigation application or has extended an offer and the time frame for acceptance has not expired.

**If the documentation was received less than 38 days prior to a scheduled foreclosure sale, we will evaluate the account for a loss mitigation option and suspend the foreclosure sale, if appropriate.**

Green Tree will not be in violation if the foreclosure sale is not suspended when:

• A court (if any), or a bankruptcy court in a bankruptcy case, or a public official charged with carrying out the foreclosure, fails or refuses to halt some or all activities in the matter, after Green Tree has made reasonable efforts to move the court or request the public official to stop the foreclosure.

• Action is taken to protect the interests of the owner, investor or guarantor of the account 

CFPB LM Ack. – FNMA IIN, 07/29/2014                YAFNMZ24 1.4

by you or other parties in the foreclosure process.

For all first lien mortgage accounts: You have the right to receive a copy of all written appraisals or valuations developed in connection with an account modification application.

If you wish to discuss your account or have any other questions, please contact your account representative. Your assigned account representative is Anita S. at 1-800-643-0202 extension 69961.

Please be advised that any loss mitigation option that Green Tree is able to provide on this account will not be applicable to any other mortgage accounts or liens that you may have on this property. Please contact the servicer(s) of any other mortgage account or lien that is secured by this property in order to discuss loss mitigation options that may be available to you.

Counseling is available at no charge from HUD-approved counselors through the HOPE Hotline: 1-888-995-HOPE. This housing counseling on-demand service is available 24-hours a day/7-days a week in Spanish and English (other languages available on request). You may also visit http://www.hud.gov/offices/hsg/sfh/hcc/fc/.

Green Tree has designated the following address where mortgage loan customers must send any Qualified Written Request, Notice of Error, or Request for Information: PO Box 6176 Rapid City SD 57709-6176.

Sincerely,

Green Tree
1-800-643-0202
Monday - Friday 7 a.m. to 8 p.m., and Saturday 7 a.m. to 1 p.m. CST

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose.



Page 1 of 11

Return To:



**EXHIBIT**

tabbies

**G**

———[Space Above This Line For Recording Data]———

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated June 13th, 2002
together with all Riders to this document.
(B) "Borrower" is   JANET WASHINGTON, An Unmarried Woman, Sole
JONNA WASHINGTON UNMARRIED

Rebecca Prem Groppe
Hamilton County Recorders Office
Doc #: 02-0140113 Type: MT
Filed: 07/16/02 01:38:36 PM   $70.00
Off.Rec.: 08966   03848   F  16  625

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Safeway Mortgage

Lender is a    Corporation
organized and existing under the laws of    the State of Ohio

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3036  1/01

 -6(OH) (0201)
Page 1 of 15           Initials:_____
       VMP MORTGAGE FORMS - (800)521-7281

8966   .3848

Lender's address is   260 Northland Blvd., Cincinnati, OH 45246

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated    June 13, 2002
The Note states that Borrower owes Lender One Hundred One Thousand and no/100.
                                                                                                                Dollars
(U.S. $   101,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  July 01, 2032
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                 ☐ Biweekly Payment Rider      ☐ Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

-6(OH) (0201)                          Page 2 of 16                  Initials: ___        Form 3036  1/01

8966    3849

(F) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the County of Hamilton :

[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

LAND SITUATED IN THE CITY OF CINCINNATI, HAMILTON COUNTY, OHIO DESCRIBED AS: SEE TITLE

Parcel ID Number: 596-4-101      which currently has the address of
1045 CHURCH AVE                                   [Street]
CINCINNATI               [City], Ohio    45246    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

-6(OH) (0201)                Page 3 of 15      Initials_____      Form 3036  1/01

8966     3850

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

8966    3851

ELECTRONICALLY FILED 05/20/2013 13:07  /  IFFO  /  A 1303699  /  CONFIRMATION NUMBER 250932

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6(OH) (0201)                     Page 5 of 15          Initials:                Form 3036   1/01

8966      3852

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

8966     3853        J. W.

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

8966        3854        J. W

ELECTRONICALLY FILED 05/20/2013 13:07  /  IFFO  /  A 1303699  /  CONFIRMATION NUMBER 250932

Case: 1:15-cv-00354-SJD-KLL Doc #: 54 Filed: 01/30/17 Page: 55 of 63 PAGEID #: 841

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

8966    3855

ELECTRONICALLY FILED 05/20/2013 13:07 / IFFO / A 1303699 / CONFIRMATION NUMBER 250932

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

8966  .3856

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6(OH) (0201)                    Page 10 of 15            Initials:_____           Form 3036    1/01

8966        3857

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6(OH) (0201)          Page 11 of 15          Initials:_____          Form 3036  1/01

8966     3858          

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

OHIO -6(OH) (0201)                    Page 12 of 15                 Initials:_____        Form 3036  1/01

8966    3859    J.W.

NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Certain Other Advances. In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, Hamilton County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.

8966    3860

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                     JANET WASHINGTON          -Borrower

_____     _____ (Seal)
                                     JONNA WASHINGTON          -Borrower

_____ (Seal)     _____ (Seal)
                        -Borrower                               -Borrower

_____ (Seal)     _____ (Seal)
                        -Borrower                               -Borrower

_____ (Seal)     _____ (Seal)
                        -Borrower                               -Borrower

-6(OH) (0201)          Page 14 of 15          Form 3036  1/01

8966 · 3861

STATE OF OHIO,         HAMILTON        County ss:

    This instrument was acknowledged before me this    13th   of      June, 2002     , by
JANET WASHINGTON, An Unmarried Woman
Jonna Washington Unmarried

My Commission Expires:



MICHAEL C. GRABEMAN
Notary Public
In and for the State of Ohio
My Commission Expires
May 1, 2007

_____
Notary Public

             This instrument was prepared by
Dan Godsey, Manager
Safeway Mortgage
260 Northland Blvd.
Cincinnati, OH 45246

-6(OH) (0201)            Page 15 of 15      Initials: _____      Form 3036   1/01

8966    3862

EXHIBIT "A"

LEGAL DESCRIPTION

SITUATED IN THE CITY OF CINCINNATI, COUNTY OF HAMILTON AND STATE OF OHIO AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT PARCEL OF REAL ESTATE SITUATE IN SPRINGFIELD TOWNSHIP, HAMILTON COUNTY, OHIO, KNOWN AND DESIGNATED AS LOT NO. SIXTEEN (16) IN GROSS AND DIETRICH'S SUBDIVISION ON THE PLAT OF THE VILLAGE OF GLENDALE, OHIO, RECORDED IN PLAT BOOK 1, PAGE 229 OF THE HAMILTON COUNTY, OHIO RECORDS; SAID LOT NO. SIXTEEN (16) FRONTING ONE HUNDRED (100) FEET ON THE CHURCH AVENUE AND RUNNING THENCE IN A WESTERLY DIRECTION THREE HUNDRED AND FOUR (304) FEET AND A FRACTION, MORE OR LESS.

PARCEL NUMBER: 596-4-101

8966    3863